**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Paul Edward HROMADA,
Defendant–Appellant.**

**No. 93–4717.**

United States Court of Appeals,
Eleventh Circuit.

April 6, 1995.

---

Bonnie Phillips–Williams, Asst. Federal Public Defender, Miami, FL, for appellant.

Kendall Coffey, U.S. Atty., James M. Hopkins, Linda Collins Hertz, Dawn Bowen, Asst. U.S. Attys., Miami, FL, for appellee.

Before KRAVITCH and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

A federal grand jury charged Appellant Paul Edward Hromada in a two-count indictment with possession of marijuana plants and a mixture and substance containing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count I), and knowingly maintaining a place for the purpose of manufacturing and distributing marijuana, in violation of 21 U.S.C. § 856(a) (Count II). Hromada pled guilty to both counts, but reserved his right to appeal the district court's denial of his motion to suppress and for review of his sentencing. See Fed.R.Crim.P. 11(a)(2). For the reasons that follow, we affirm the district court's ruling and Hromada's sentence.

## I. BACKGROUND

### A. Factual Background

A confidential informant tipped Broward County, Florida authorities that Hromada sold marijuana that he grew in his Lauderdale Lakes home. The informant told police that he had seen the plants, but that it had been "some time" ago.[1] As a result, Detective Robert Diekmann, Jr. of the City of Margate (Florida) Police Department began an undercover investigation of Hromada through visual surveillance and recorded telephone conversations, ending in hand-to-hand drug deliveries.[2] During November 1991, Hromada made two quarter-ounce sales of marijuana to Diekmann (totalling $140) at a Lauderdale Lakes Sports Authority parking lot. Each time, Hromada arranged delivery at the parking lot and not at his home.

There were strong indications that Hromada did not operate alone. On the day of the first drug transaction, Hromada was observed leaving and returning to his home with a woman companion who was present during the sale. Also, during one recorded telephone call to Hromada's home, Diekmann overheard Hromada consult with a male at his home about the price he should charge for the drugs.

Although there were negotiations for a larger "buy," Hromada and Diekmann could not agree on price and Hromada indicated that he could not supply the quantity of marijuana the agent wanted. At this point, Diekmann ended his investigation and obtained a warrant for Hromada's arrest.

On the morning of the arrest, Detective Sherie McKeon of the Broward County Sheriff's Department briefed participating officers. She told them that the arrest involved narcotics and that the suspect had at least one roommate. McKeon also outlined the layout of the house.[3]

About 6:00 a.m., Special Response Team (SRT) Officer Mark Davis knocked loudly on the front door of Hromada's house and shouted "Sheriff's Office, arrest warrant." Several seconds later a man (later identified

1. Participating authorities agreed that the information was not current or sufficiently complete to justify a search warrant.

2. Aerial photographs of Hromada's house and backyard greenhouse were taken prior to arrest.

3. Participating officers included McKeon, Diekmann, six members of the Broward County Special Response Team (SRT), other members of the Broward County Sheriff's Department, and one special agent from the Drug Enforcement Administration (DEA).

as Hromada) appeared at the large picture window next to the front door. Davis shouted at him to open the door. Hromada did not respond to Davis' demand but continued to stand at the window. After that the SRT broke the front door open and entered the house.

Once Hromada was secured in the living room, the officers fanned out through the house to check all other rooms and areas. They discovered Hromada's girlfriend in one room, and the roommate in another, and brought them to the living room. During their passage through the house, officers observed an abundance of marijuana plants, high intensity lights, and cultivation equipment in plain view in the master bedroom and closet, the master bathroom, and a second bedroom.[4]

### B. Procedural Background

Hromada was arrested on December 6, 1991, and released on a $25,000 personal surety bond while awaiting trial, requiring him to submit to random urinalysis for drug testing. In January 1992, Hromada tested positive twice for drug use.[5]

Hromada moved to suppress the 126 marijuana plants and other physical evidence seized by law enforcement officers from his house and backyard greenhouse. After an evidentiary hearing, the district court granted the motion in part, as to the greenhouse, and otherwise denied it.[6] Thereafter, Hromada entered his conditional plea of guilty to the indictment.

At sentencing, the district court refused to adjust Hromada's sentence for acceptance of

responsibility and sentenced him to sixty-three months' imprisonment.

## II. ISSUES ON APPEAL

Hromada raises three issues on appeal: (1) whether the district court erred in denying his motion to suppress on the grounds that the arresting officers had not failed to comply with the knock and announce rule pursuant to 18 U.S.C. § 3109; (2) whether the district court erred in denying his motion to suppress evidence seized incident to his arrest and in plain view during a protective sweep of his house; and (3) whether the district court erred in refusing to grant him a two-level downward adjustment for acceptance of responsibility under the Sentencing Guidelines.

## III. STANDARDS OF REVIEW

### A. Motion to Suppress

▉ Because ruling on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo. United States v. Ramos, 12 F.3d 1019, 1022 (11th Cir.1994). Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the party prevailing in the district court, i.e., in this case, the Government. United States v. Behety, 32 F.3d 503, 510 (11th Cir.1994).

### B. Sentencing Guidelines

▉ Whether a defendant is entitled to a sentencing reduction for acceptance of responsibility is a factual determination that

---

4. McKeon advised Hromada, his girlfriend, and roommate of their Miranda rights, which they acknowledged. She then asked Hromada if he would consent to a search of his home. He agreed and McKeon provided him with a standard consent form. After he signed the form, Hromada directed the officers to more marijuana cuttings in the utility room, and, in an orange plastic container next to the master bedroom dresser. They also found a timer, an illuminated microscope, and a fan in the master bathroom; cannabis seeds, a high pressure sodium bulb, and papers regarding hydroponics equipment in the master bedroom; and a scale in the living room. A .22 rifle and a pellet gun were discovered in the master bedroom.

5. Hromada first tested positive for cocaine and benzodiazepines, the second time for opiates/codeine. In both instances, Hromada lied to his pretrial services officer about his drug use.

6. Of the 126 marijuana plants seized, the district court suppressed the ten plants found in the greenhouse; it was padlocked on the outside, and because of its limited access, a reasonable officer would conclude that an individual could not be hiding inside. The Government does not contest this ruling.

must be affirmed on appeal unless clearly erroneous. *United States v. Campbell*, 888 F.2d 76, 78 (11th Cir.1989), *cert. denied*, 494 U.S. 1032, 110 S.Ct. 1484, 108 L.Ed.2d 620 (1990). A district court occupies the unique position to evaluate whether a defendant has accepted responsibility for his acts; its determination is entitled to great deference on appeal. U.S.S.G. § 3E1.1, comment. (n. 5); *United States v. Pritchett*, 908 F.2d 816, 824 (11th Cir.1990).

## IV. DISCUSSION

### A. *Motion to Suppress*

#### 1. *Knock and Announce.*

 Hromada moved to suppress evidence seized from his home claiming that the arresting officers failed to comply with the knock and announce provision of 18 U.S.C. § 3109.[7] The statute provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of a warrant.

18 U.S.C. § 3109 (1948).

Hromada claims that the arresting officers illegally entered his house because they violated the "language and spirit" of § 3109. In the same breath Hromada appears to concede that the officers did knock on the door and announce their purpose. Asserting that they gave him less than a minute to open the front door (before they broke it down), he contends that he never had the opportunity to refuse them admittance. The Government claims that because Hromada exhibited no sign that he intended to open the door, taking no step to do so, they were constructively refused admittance, so it was reasonable to conclude that forcible entry was required.

We characterize Hromada's inaction more as a failure to admit than a constructive refusal to admit. However, semantics aside, in a drug bust of this sort, if a suspect's resistance to arrest places the arresting officer in the position of being a target, the officer need not linger there unduly long. The officers knew this was a narcotics arrest. They knew Hromada had at least one roommate, whose whereabouts was unknown. The officers also had been tipped that the house was more than just a place to go to buy marijuana, that it was a place for marijuana cultivation and distribution. Granted, there was not sufficient probable cause to support a search warrant, but one does not have to have probable cause or proof beyond a reasonable doubt before protecting himself or herself from potential or likely violence. It would be reasonable for a prudent officer, undertaking this arrest, to provide for more than his customary escort. Guns and violence go hand-in-hand with illegal drug operations.[8] Any further delay may well have involved great risk to the officers undertaking the arrest.

There is no clear error in the district court's findings, and, the facts do not support Hromada's § 3109 claim.

#### 2. *Search of the House Incident to Arrest.*

 Next Hromada claims that the officers violated his Fourth Amendment rights by illegally searching his home while executing his arrest warrant. He concedes that the officers possessed a valid arrest warrant but asserts that their warrantless search and subsequent seizure of his marijuana plants

---

7. The defendant has the burden of establishing a prima facie case that a knock and announce violation has occurred under § 3109, and overcoming the presumption of Government propriety. *United States v. Gardner*, 553 F.2d 946, 949 (5th Cir.1977), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978).

8. For a good discussion of the often found connection between drug trafficking, guns, and violence *see United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir.1986) ("[G]uns are a tool of the drug trade."), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987) and *Harmelin v. Michigan*, 501 U.S. 957, 1003, 111 S.Ct. 2680, 2706, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in judgment) ("Studies ... demonstrate a direct nexus between illegal drugs and crimes of violence," citing Goldstein, *Drugs and Violent Crime, in Pathways to Criminal Violence* 16–48 (N. Weiner, M. Wolfgang eds., 1989)).

and narcotics paraphernalia did not fall within the protective sweep exception set forth by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

■ In *Buie*, the Court examined the constantly competing values of personal privacy and efficient police investigation in the warrantless search of an arrestee's home, and held, that under certain circumstances, a protective search does not violate the Fourth Amendment. The Court found a protective sweep, incident to a lawful arrest, valid, if it was "a quick and limited search of a premises, ... conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327, 110 S.Ct. at 1094. Officers faced with risks during in-home arrests are permitted "to take reasonable steps to ensure their safety after, and while making, the arrest." *Id.* at 334, 110 S.Ct. at 1098. A balance of the competing interests of the arrestee and the arresting officers, the Court found, suggested that the officers' interest in their safety is "sufficient to outweigh the intrusion such procedures may entail." *Id.* Officers have a legitimate interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333, 110 S.Ct. at 1097–98.[9]

The purpose of the protective sweep of Hromada's house was to secure it and investigate the officers' reasonable suspicion of danger. It was also reasonable for them to believe that Hromada's girlfriend and roommate were inside. *See United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir.) (en banc), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991) (a reasonable belief that

someone else could be inside the house permits a protective sweep).

It is clear from the record that this was not a full-blown search. The SRT opened doors only to areas large enough to harbor a person. There is no evidence that the officers opened drawers or that the sweep of the house was overextensive.[10] In fact, the sweep was short; it lasted only about a minute. *See United States v. Delgado*, 903 F.2d 1495, 1502 (11th Cir.1990) (cursory sweep of area which reasonably prudent officer believes to be harboring suspect must last no longer than is reasonably necessary to dispel suspicion of danger). Viewing the facts in the light most favorable to the Government, the protective sweep exception applies.

■ No one questions the validity of the charges against Hromada. It is clear that he twice sold marijuana to an undercover detective. This criminal conduct exposed him to arrest and its resulting consequences, and that includes the discovery of contraband in plain view. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990).[11] At Hromada's house, it would have been hard to miss seeing rooms full of thriving marijuana plants growing under high intensity lights. If an officer has lawfully executed a valid arrest warrant, he is not required to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid further charges. *Id.* The agents were free to seize any evidence they discovered in plain view within the proper scope of the protective sweep. *Tobin*, 923 F.2d at 1513.

■ Hromada also contends that the arrest warrant was used as a subterfuge to conduct a search of his house. To support his claim, he argues that Detective Diekmann's testimony during the suppression hearing was to the effect that it was his

---

9. The Court recognized that the dangers presented by in-home arrests are often greater than those conducted on the street due to the "home turf" advantage the suspect has over the police. *Buie*, 494 U.S. at 333, 110 S.Ct. at 1098. Hromada's knowledge of the layout of his own house and other people in the house gave him an advantage that he would not otherwise have had if the arrest were conducted elsewhere.

10. *See supra* note 6.

11. An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent. *Horton*, 496 U.S. at 136–37, 110 S.Ct. at 2308.

"goal" to search the house.[12] Just because a police officer is *glad* to have the opportunity to see that which is apparent at the scene of a valid arrest—when it is his *duty* to make the arrest—does not make his seeing these things invalid. Just because the police officers were *glad* that they could capitalize on the opportunity by incidentally seeing what was in plain view is of no moment. Whether or not a Fourth Amendment violation has occurred depends upon objective reasonableness in light of the facts and circumstances. *See Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978); *see also United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Diekmann's actual intent or motivation is irrelevant.[13]

The district court was not clearly erroneous in finding that, based upon the information the arresting officers had at the time, it was reasonable for them to take steps to ensure their safety. Their one-minute protective sweep of Hromada's house is not inconsistent with the Fourth Amendment. Evidence found in plain view during the sweep may be properly seized. *Buie,* 494 U.S. at 329–30, 110 S.Ct. at 1096; *see United States v. Kimmons,* 965 F.2d 1001, 1010 (11th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1065, 122 L.Ed.2d 370 (1993).

**B.** *Sentencing Guidelines—Acceptance of Responsibility*

Hromada claims that he accepted his responsibility and pled guilty at the earliest convenient time.[14] He asserts that during the two year liberty period, he was subjected to bi-weekly urinalysis, and, it was only when he was initially released that he had any positive reports, and these two "indiscretions" are not sufficient to deny him the benefit of accepting the responsibility for his crime.[15] The Government argues that adjustment is unwarranted because, besides using drugs while on bond, Hromada lied twice to his pretrial services officer about using them.[16] To adopt Hromada's argument, the Government contends, would give any defendant one or two free passes to violate the law or breach pre-trial release conditions. We agree.

Here the district court was in the unique position to evaluate whether Hromada had truly accepted the responsibility for his actions. It found his continued use of drugs while on pre-trial release to be determinative (regardless of when it occurred), and we give great deference to this evaluation on appeal. *United States v. De La Rosa,* 922 F.2d 675, 680 (11th Cir.1991).

## V. CONCLUSION

We AFFIRM the district court's ruling on the motion to suppress and Hromada's sentence.

AFFIRMED.

---

12. On direct examination conducted by defense counsel, Diekmann testified:
 Q. Isn't it true that the goal of your investigation was to search the house?
 A. That's correct. That's what we were going to do when we entered the house.
 Q. And that was your goal from the outset, right, from the first time you talked to Jackie Cohen, right?
 A. That's correct.

13. In *Scott,* the Court stated "[w]e have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action." 436 U.S. at 138, 98 S.Ct. at 1723.

14. Under the Sentencing Guidelines, a defendant's offense level is decreased by two levels if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1.

15. At sentencing, counsel for Hromada asserted that the drugs were sedatives used as a result of Hromada's anxiety about his arrest and his son's welfare.

16. In determining whether a defendant qualifies for an acceptance of responsibility, consideration may be given to "voluntary termination or withdrawal from criminal conduct or associations." U.S.S.G. § 3E1.1, comment. (n.1(b)).