[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 04-12077

D. C. Docket No. 02-00418 CR-1-1

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 15, 2005
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GARY BERNARD MCGOUGH,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Georgia

**(June 15, 2004)**

Before EDMONDSON, Chief Judge, BIRCH and COX, Circuit Judges.

COX, Circuit Judge:

I. Introduction

Atlanta police officers saw a revolver and marijuana in the back bedroom of

Gary McGough's apartment, which they first entered without a warrant and without

McGough's consent. The district court denied McGough's motion to suppress evidence found in the apartment, and a jury found him guilty of being a felon in possession of a firearm, possessing marijuana with intent to distribute, and using and carrying a firearm in connection with a drug trafficking offense. McGough appeals, challenging the district court's denial of his motion to suppress. On appeal, the Government asserts that the police officers were permitted to enter McGough's apartment as part of their role as community caretakers. We assume *arguendo* that there is a community caretaking exception to the Fourth Amendment. But, we conclude that the police officers' community caretaking responsibilities did not, under these circumstances, permit them to enter McGough's apartment without a warrant and without his consent. The district court erred in denying McGough's motion to suppress, and we vacate his convictions.

## II. Background & Procedural History

On the evening of May 3, 2001, Gary McGough locked his five-year-old daughter Queenice in his apartment and left to pick up a pizza for dinner.[1] At home

---

[1]The motion to suppress was referred to a magistrate judge. Our recitation of the facts is based on the magistrate judge's finding of facts. (R.1-28.) The district judge, "[a]fter careful consideration of the transcript of the evidentiary hearing," agreed with and accepted the magistrate judge's findings of fact. (R.1-33 at 2.)

At times, the magistrate judge's Report and Recommendation merely recites the testimony, without making a factual finding. Our statement of the facts to some extent mirrors the magistrate judge's Report in this respect.

alone, Queenice tried to call her aunt, Jolanda Parks, but dialed 911 by mistake. She abruptly hung up because she was afraid she would get in trouble. Sergeant William Gourley of the Atlanta City Police Department was dispatched to the apartment. When Sergeant Gourley arrived, he saw the child locked inside behind a heavy door with burglar bars. Sergeant Gourley testified that the child seemed scared, and told him that she could not get out because she did not have the key to unlock the door.

Sergeant Gourley called the Atlanta Fire and Rescue Department so that they could force open the burglar bar door. While waiting for the firemen, another officer, Walter McReady, arrived on the scene. Officer McReady also testified that Queenice was scared and was hanging onto the burglar bar door like she wanted to get out of the apartment. Gary McGough returned to the apartment at the same time the firemen arrived on the scene. McGough asked the officers what was going on and told Sergeant Gourley that this was his apartment. Sergeant Gourley asked McGough if he had a key. McGough said yes and unlocked the apartment door. The officers then placed McGough under arrest for reckless conduct.[2] One of the officers called Queenice's aunt, Jolanda Parks, who said that she would come over to take care of

---

[2]Sergeant Gourley testified that McGough's "actions towards his daughter showed a disregard for her safety. This is a second-story apartment. She had no way to get out. It's an older building. It's probably maybe 15 or 20 years old. It's a wooden structure. If a fire had broken out in one of the other apartments in that building, this child wouldn't have had any way to get out." (R.3 at 9.)

Queenice. McGough was handcuffed and placed in a police car parked in the driveway. Queenice was allowed to sit in the police car with her father until her aunt arrived.

With McGough under arrest, Sergeant Gourley contacted a third officer, John Brock, and asked him to come to the scene to assist. Sergeant Gourley told Officer Brock that he was outside of an apartment that had a heavy, burglar bar door and a mounted surveillance camera. When Officer Brock arrived, Queenice was already out of the apartment, and McGough was handcuffed in the back of the patrol car. Sergeant Gourley showed Officer Brock the burglar bar door and the surveillance camera. Sergeant Gourley then asked McGough if there was anything inside the apartment that the officers needed to know about. McGough responded there wasn't. Sergeant Gourley asked McGough: "Do you mind if I look?" (R.3 at 26.) McGough told the Sergeant that in fact he did mind, and that the Sergeant did not have his permission to go inside.

While waiting for Queenice's aunt to arrive, the officers noticed that Queenice was not wearing shoes. Officer McReady asked Queenice if she would go in and get some shoes and clothes to take with her. But, according to Officer McReady, Queenice was too scared to go inside by herself. Officer McReady picked Queenice up and carried her up the stairs and inside the apartment, with Sergeant Gourley

4

following close behind. Sergeant Gourley recalls that Aunt Parks had already arrived when he and Officer McReady went into the apartment with Queenice. Officer McReady was unsure whether Aunt Parks was already there at that point, or if she was on her way. Officer Brock stated in an affidavit that Aunt Parks had already arrived at the apartment when the officers entered. The magistrate judge found that although there was conflicting testimony as to when exactly Aunt Parks arrived at the scene, it was either before or while the officers entered the apartment. (R.1-28 at 12.) The magistrate judge also found that there was no immediate threat or danger that necessitated the officers entering McGough's apartment. (Id.)

Once inside the apartment, the officers took Queenice into the back bedroom. Queenice hopped onto the bed, put on her shoes, and pointed to a bar that was set up in the room. On top of the bar, Sergeant Gourley saw what appeared to be a bag of marijuana with a revolver sitting on top of it. According to Officer McReady, Queenice pointed to the gun and said "that's the gun my father uses to kill people." (R.3 at 49.) Sergeant Gourley yelled for Officer Brock to come inside. The Sergeant showed Officer Brock the gun and the bag of marijuana. Queenice gathered her clothes, and the officers and Queenice left the apartment.

Officer Brock left to obtain a search warrant. Sergeant Gourley said he and Officer McReady secured the apartment and waited outside for Officer Brock to

5

return with a warrant. Aunt Parks, however, testified that while she was waiting in the parking lot downstairs she heard music coming from McGough's apartment, and could see the officers through the blinds playing pool inside. An hour or so later, Officer Brock returned with the warrant, and the officers searched the apartment.

The officers said that the apartment was set up more like a nightclub than a home. The windows were spray painted black; a disco ball hung from the ceiling over a dance area. There were several couches, a juke box, a pool table, a bar, and cases of beer stacked in a closet near a couch and a refrigerator. In addition to the marijuana and the .38 caliber revolver in the back bedroom, the officers found a bag of marijuana in the bar, a bag of marijuana hidden in a cubbyhole, and a 12 gauge shotgun underneath a couch. Behind the couch, the officers uncovered a hidden compartment in the wall with a bag full of cash inside. The officers also discovered more than one thousand dollars in cash in a jacket pocket, a .25 caliber handgun in a basket in the bathroom, a cooking pot with marijuana stems simmering in the kitchen, two trash bags full of marijuana in the attic, and several rounds of ammunition.

McGough was charged in the United States District Court for the Northern District of Georgia with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), with possessing more than five kilograms but less than ten kilograms

6

of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) and 851, and with using and carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. 924(c). McGough pleaded not guilty to all three charges.

McGough filed a motion to suppress the firearms, the marijuana and the money. He argued that the officers had no legal authority to enter his apartment, and that Officer Brock's search warrant could not be used to retroactively validate the prior illegal entry and search. A magistrate judge held an evidentiary hearing and issued a Report and Recommendation, concluding that McGough's motion to suppress should be granted. The district judge, while accepting the magistrate judge's findings of fact, rejected her recommendation and denied the motion to suppress. The case proceeded to trial and the jury found McGough guilty on all three counts. The district court sentenced McGough to 100 months on Counts One and Two, to be served concurrently, and 60 months on Count Three, to be served consecutively to the sentences imposed on Counts One and Two. McGough appeals.

III.   Issues on Appeal and Standards of Review

McGough raises several issues on appeal, but only his first argument - that the

district court erred in denying his motion to suppress - warrants discussion.[3] Our review of the district court's denial of McGough's motion to suppress is a mixed question of law and fact. *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). We review the district court's findings of fact under the clearly erroneous standard, whereas the district court's application of the law to these facts is subject to de novo review. *Id.*

## IV. Contentions of the Parties

McGough argues that the district court erred in denying his motion to suppress. McGough contends that there was no urgent need for the officers to enter his apartment, either to help Queenice or to get her shoes. Queenice's aunt had either arrived at the apartment when the officers entered, or was on her way, and she could have gathered Queenice's belongings. McGough instead suggests that the officers were suspicious of the apartment, and that their real reason for entering was to search for evidence of a crime. McGough asserts that this case is unlike other cases in which

---

[3]McGough argues that the evidence was insufficient to establish that he used or carried a firearm during a drug trafficking offense. We find this argument meritless and conclude that it warrants no further discussion. *See* 11th Cir. R.36-1.

McGough also contends that the district court erred by admitting hearsay statements and denying his request to supplement the court's jury instruction on using and carrying a firearm. The Government concedes that the district court erred by failing to properly charge the jury on the elements of 18 U.S.C. 924(c). McGough further asserts that during sentencing the district court violated his Fifth and Sixth Amendment rights pursuant to *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Because we conclude the district court erred in denying McGough's motion to suppress, we do not reach these other issues.

courts have approved the warrantless entry of a home. Once the door was unlocked and Queenice was safely outside, there was no longer an emergency, and there was no reason for the police to believe that anybody else was in danger.

The Government responds that the officers' initial entry into the apartment was not a search because the officers were acting in their community caretaking function. It was in their capacity as community caretakers, the Government contends, that the officers observed the revolver and the marijuana in plain vew. Other courts have recognized that a police officer's community caretaking responsibilities will under some circumstances permit them to enter a home without a warrant in order to help members of the community. The Government further notes that it was McGough's own recklessness - leaving his daughter unattended in a locked apartment - that led the police to the scene in the first place, and made their decision to enter his apartment reasonable under the circumstances. According to the Government, the officers were only acting for Queenice's benefit. The Government urges us to recognize that police officers' community caretaking responsibilities should allow them, in situations like this, to enter a home without a warrant for a limited and necessary purpose.

## V. Discussion

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures. Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection. *See Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371,1379-80 (1980) (the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134 (1972)); *see also Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041-42 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. . . . With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.") (internal citations omitted). It is indeed a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586, 100 S. Ct. at 1380.

The Fourth Amendment's prohibition of warrantless searches is not, however, absolute. Courts recognize that there are some situations where "the public interest requires some flexibility in the application of the general rule that a valid warrant is

a prerequisite for a search." *Holloway,* 290 F.3d at 1334 (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S. Ct. 2586, 2590 (1979)).[4]  But we will depart from the general rule requiring a warrant as a prerequisite for a search in only a few, exceptional circumstances.  For example, we have explained that police officers have the right in certain instances to conduct a limited, protective search if they are executing an arrest warrant in a person's home. *United States v. Hromada,* 49 F.3d 685, 690 (11th Cir. 1995).  We recognized that police officers often face greater risks when arresting someone in their home, as opposed to on the street, and therefore are permitted "to take reasonable steps to ensure their safety after, and while making, the arrest." *Id.* (quoting *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 1098 (1990)).  Nor do we question the right of the police to respond to dangerous or emergency situations.  The Fourth Amendment "does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.  Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978).  And, if the police see contraband in plain

---

[4] The burden of proving an exception to the warrant requirement rests with the government. *Holloway*, 290 F.3d at 1337 (citing *United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93, 95 (1951)).

view while inside a home executing an arrest warrant, or responding to a legitimate emergency, they may seize it as evidence of a crime. *See, e.g., Mincey*, 437 U.S. at 392, 98 S. Ct. at 2413; *see also Hromada*, 49 F.3d at 690 ("If an officer has lawfully executed a valid arrest warrant, he is not required to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid further charges.").

Several courts have carved out another exception to the Fourth Amendment's prohibition against warrantless searches of the home based on the so-called "community caretaking functions" of police officers. The Fifth Circuit has described community caretaking functions as those actions by police officers that are "totally divorced from the protection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *United States v. York*, 895 F.2d 1026, 1030 (5th Cir. 1990) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973)). In *York*, for example, officers responded to a call by a houseguest, who complained that their host, Ellis York, was drunk and belligerent and was threatening the guest's children. York's daughter arrived and the houseguests invited the officers inside, where they observed several machine guns. York was later convicted for illegally receiving and possessing the guns. The Fifth Circuit affirmed the conviction, concluding that it was reasonable to expect the guest to ask police officers to come inside the house to keep the peace. The court noted that the police initially

12

entered only the first room of the house, "where they had a right to be as peacekeepers." *York*, 895 F.2d at 1030. The police officers in *York* did not have a warrant to enter the house, but were nevertheless found to be lawfully inside in their role as community caretakers.

In a similar case, the Eighth Circuit affirmed the conviction of Jon Nord, who was found by a police officer in his apartment after he was reported missing from work. *United States v. Nord*, 586 F.2d 1288, 1289 (8th Cir. 1978). The person looking for Nord first got a key to his apartment from the landlord, and then called the police to come inside with him. Inside the apartment, the officer found Nord, drunk, and also observed guns in plain view. Nord was subsequently convicted of being a felon in possession of firearms. The court concluded that the "police had a right to be on the premises as part of their routine community caretaking functions which include responding to calls to assist persons in need of immediate aid." *Id.* at 1290.[5]

---

[5]Other courts have recognized that police officers may enter a house without a warrant based on what could be characterized as their community caretaking functions. *See United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003) (officers lawfully entered a home to locate a nine-year-old boy whose mother had just been arrested on drug charges); *United States v. Butler*, 980 F.2d 619 (10th Cir. 1992) (officers lawfully accompanied a man under arrest back into his house after noticing broken glass on the ground near the man's feet and that the man was not wearing shoes); *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996) (officer was permitted to enter a home at two in the morning after four to eight pajama-clad neighbors complained about the loud music coming from inside, and nobody answered the officer's knocks on the front door or windows); *United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000) (officer lawfully entered house to ask the wife of the partially-

Relying on *York* and *Nord*, the Government argues that the police officers' community caretaking function justified their warrantless entry into McGough's apartment. Unlike other federal courts, we have never explicitly held that the community caretaking functions of a police officer permits the warrantless entry into a private home. We have, however, recognized that certain exigent circumstances may compel an officer to enter a home without a warrant. In *United States v. Holloway*, 290 F.3d 1331 (11th Cir. 2002), a police officer conducted a warrantless search of a house in response to 911 calls reporting gunshots and fighting inside the house. The officer arrived at the house and drew his gun "[d]ue to the high-risk nature of the 911 call." *Id.* at 1332. Holloway and his wife were arguing, and there were several beer cans and shotgun shells in the yard. After breaking up the fight, the officer saw an 870 Remington shotgun leaning against Holloway's mobile home. Holloway was convicted of possession of a firearm by a convicted felon. We concluded that "when exigent circumstances demand an immediate response, particularly where there is danger to human life, protection of the public becomes paramount and can justify a limited, warrantless intrusion into the home. Once in the home, officers may seize any evidence found within plain view." *Id.* at 1334. Our conclusion was grounded in the exigent circumstances exception to the warrant

clothed man he had just arrested outside for a shirt and shoes before he took him to jail).

14

requirement, which encompasses several situations where it is simply not feasible for an officer to obtain a warrant, including the danger of escape, the destruction of evidence, the risk of harm to the public or police, the mobility of a vehicle, and hot pursuit. *Id.*

We assume *arguendo*, for the purposes of this appeal, that there is a community caretaking exception to the Fourth Amendment's warrant requirement. The facts of this case, however, do not justify its application. Unlike in *York*, the Atlanta police officers had the situation under control before they entered McGough's apartment. McGough was under arrest and in custody in the police cruiser, and Queenice was safely outside. There was no immediate threat, such as the drunken and potentially dangerous behavior in *York*, that necessitated the officers' warrantless entry into McGough's apartment. Nor were there any exigent circumstances, such as the sounds of gunshots, fighting and "the potential danger to human life" present in *Holloway*, that would have justified the officers' decision to enter McGough's home. And, McGough objected to the officers' request to enter the apartment to look around.

Ostensibly, the officers entered McGough's apartment to get Queenice's shoes. The magistrate judge, however, noted that the officers were suspicious of the heavy burglar bar door and the surveillance camera outside of the apartment. The magistrate judge concluded that the officers did not enter the apartment for reasons "'totally

15

divorced from the detection, investigation, or acquistion of evidence relating to the violation of a criminal statute.'" (R-1-28 at 13) (quoting *Cady*, 413 U.S. at 441, 93 S. Ct. at 2528). But the test, of course, is an objective one. Warrants are generally required to search a person's home unless the exigencies of the situation make the officers' needs "so compelling that the warrantless search is *objectively* reasonable under the Fourth Amendment." *Mincey*, 437 U.S. at 394, 98 S. Ct. at 2414 (emphasis added); *see also Whren v. United States,* 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

In this case, the exigencies of the situation - Queenice's need for her shoes - are not compelling enough to find that the officers' warrantless entry into McGough's apartment was objectively reasonable. Were we to apply the community caretaking exception to the Fourth Amendment in this case, we would undermine the Amendment's most fundamental premise: searches inside the home, without a warrant, are presumptively unreasonable. *See Payton*, 445 U.S. at 586, 100 S. Ct. at 1380. The Government has not carried its burden of proving that any exception to the Fourth Amendment's warrant requirement applies. We therefore hold that the police officers' community caretaking responsibilities did not, under these circumstances,

permit them to enter McGough's apartment without a warrant and without his consent.

We also conclude that the good faith exception to the exclusionary rule is not applicable in this case. The exclusionary rule operates to prevent the government from using evidence seized as the result of an illegal search in a subsequent criminal prosecution. *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002). The Supreme Court, however, in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984) articulated a good faith exception to the exclusionary rule. The Court held that "the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." 468 U.S. at 900, 104 S. Ct. at 3409. Since the purpose of the exclusionary rule is to deter unlawful police misconduct, when officers engage in an "objectively reasonable law enforcement activity" and act in good faith and in reliance on a search warrant from a judge, the *Leon* good faith exception applies. *Martin,* 297 F.3d at 1313 (*citing Leon*, 468 U.S. at 919-20, 104 S. Ct. 3405).

In this case, it was not an "objectively reasonable law enforcement activity" but rather the officers' unlawful entry into McGough's apartment that led to Officer

17

Brock's request for a search warrant. In such a situation, "the search warrant affidavit was tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful entry into a personal dwelling." *United States v. Meixner*, 128 F. Supp. 2d 1070, 1078 (E.D. Mich. 2001); *see also United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989) (noting that "good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search"); *United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir. 1996) (declining to apply the good faith exception when the "issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"). Because the officers were not permitted to enter McGough's apartment under these circumstances, without a warrant and without his consent, we find the exclusionary rule is applicable. The evidence obtained as a result of the police officers unlawful entry into McGough's apartment should be suppressed.

## VI.  Conclusion

The police officers' community caretaking responsibilities did not, under these circumstances, permit them to enter McGough's apartment without a warrant and without his consent. We reverse the district court's denial of McGough's motion to suppress, vacate his convictions, and remand for further proceedings.

REVERSED, VACATED AND REMANDED.