LEWIS, J.,
specially concurring.
The importance of freedom and liberty upon which this nation was founded is expressed in the Fourth Amendment and its protection of our homes from the government. This precious amendment reflects who we are as a people and reflects our values that protect every citizen from unreasonable intrusions by the government. “ ‘At the very core’ of the Fourth Amendment ‘stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.’ ” Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). “Of all the places that can be searched by the police, one’s home is the most sacrosanct, and receives the greatest Fourth Amendment protection.” United States v. McGough, 412 F.3d 1232, 1236 (11th Cir.2005) (citing Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). In light of the elevated protections afforded to the privacy of one’s home, the United States Supreme Court has held that “[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.” Kyllo, 533 U.S. at 31, 121 S.Ct. 2038 (citing Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). This Court has also expressed its reluctance to intrude on the privacy of one’s home:
The Fourth Amendment establishes “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....” U.S. Const, amend. IV (emphasis added). Indeed, “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,” United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and “[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).
State v. Titus, 707 So.2d 706, 708 (Fla.1998). In my view the primary emphasis in this ease must fall on this concept of “home” and its sacred place under Fourth Amendment law.
First, the underlying basis for the search in question here, i.e., the anonymous tip, was insufficient to justify a search that would otherwise be in violation of the Fourth Amendment. In J.L. v. State, 727 So.2d 204 (Fla.1998), aff'd, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), this Court held that an anonymous tip cannot be a stand alone basis for reasonable suspicion. This Court made clear that when presented with an anonymous tip, “police must observe additional suspicious circumstances as a result of ... independent investigation” before the police can act on that tip. Id. at 207 (citing *57 Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). In unanimously upholding this Court’s decision in J.L., the United States Supreme Court also held that an uncorroborated anonymous tip is not a reliable justification for a Fourth Amendment search because, “[ujnlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated ... ‘an anonymous tip alone seldom demonstrates the informant’s basis of knowledge or veracity.’ ” Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (citing Adams v. Williams, 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)) (quoting White, 496 U.S. at 329, 110 S.Ct. 2412).
Here, the “sniff test” was conducted based on nothing more than an unverifiable anonymous tip. See State v. Jardines, 9 So.3d 1, 2 (Fla. 3rd DCA 2008). Prior to entering the private porch of Jardines, the only purported “additional suspicious circumstance” referenced by the investigating officer was that he observed the air conditioning unit running continuously for fifteen minutes without interruption. See id. If a continuously running air conditioner is indicative of marijuana cultivation, then most Florida citizens and certainly all of my neighbors would be suspected drug dealers subject to intrusive searches by law enforcement. The elevation of such a ridiculous observation in the heat of Florida cannot serve as a basis for intrusion on the heightened expectation of privacy that one enjoys in one’s home. Further, there was no evidence of any impending emergency or concern with regard to destruction of evidence. In light of the complete lack of any legitimate, articulable grounds for searching Jardines’ home, the police officer, and his accompanying dog, should not have been on Jardines’ porch “sniffing” under the front door in the first place.
Second, it is my view that the dog action here constituted a search of a home, in and of itself, and falls within the concept of a search under the Fourth Amendment. A reasonable expectation of privacy, a value of this society that has developed over many decades, applies not only to the physical, tangible items within a home, but also to the air and odors that may be within and may unintentionally escape from -within. The scent of items cooking on a stove, the whiff of an air freshener, or even the foul smell associated with a ruptured sewage line are all intimate details of a home that are expected to remain private and unavailable to the public. We as Americans have an unwavering expectation that there will not be someone, or something, sniffing into every crack, crevice, window, or chimney of our homes. We especially do not expect strangers to bring dogs onto or into our private front porches to sniff under our front doors or any of the cracks or crevices of our homes. This protected interest of the expectation of privacy will be obliterated if a single individual, manipulating an animal, is permitted to make the final determination as to whether the government should enter into a private residence based upon an unverified, uncorroborated, anonymous tip. To sanction and approve turning the “dogs loose” on the homes of Florida citizens is the antithesis of freedom of private property and the expectation of privacy as we have known it and contrary to who we are as a free people.
The private residence is completely unlike the operation of a motor vehicle on highways, the transport of suitcases in public places, or the transport of packages in public transport. See City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); United States v. *58 Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The sanctity of the private residence, above all other expectations of privacy, has been a hallmark of this nation. A private residence is the most sacred of places under the Fourth Amendment, and an intrusion into that sacrosanct privacy commands the highest level of judicial scrutiny. As articulated by the Fourth District Court of Appeal, “An airport and a highway are unquestionably public places with little or no privacy, as much as a home is undoubtedly a private place characterized by its very privacy.” State v. Robb, 920 So.2d 1175, 1186 (Fla. 4th DCA 2006). Further, luggage located in a public airport, the interior of a vehicle driving on a public highway, and the contents of a package in public transport are “quite different from a house, not only in physical attributes, but also in the historical protection granted by law.” Id. at 1184. A private home, on the other hand, is just that, a private, individual home.
While the expectation of privacy inherent within the private residence may not exist in or extend to common walkways, roadways, or other locations that are not within a private dwelling, that which is within the private residence is most assuredly protected. A hallway outside a college dormitory, for example, may not contain the same expectation of privacy as the front door and living room of a private home. We may discuss and debate the concept and extent of curtilage and the nexus with a private residence necessary to be considered part of a protected area. However, it is inescapable that the air and the content of the air within the private home is inextricably interwoven as part of the protected zone of privacy to which the expectation of privacy attaches. This air is inextricably interwoven in the constitutional context as part of the sanctity of a Florida private home and the private lives of our citizens protected therein. The home and the air within the home are expected and intended to remain within the sanctity of the home with no intent, design, or expectation that they become public or exposed beyond the walls of the home. While one of great wealth with a newly constructed air-tight private home surely has an expectation of privacy of the home and of the air constituted therein, his less wealthy Florida neighbor should not be denied the same fundamental protection simply because his less substantially constructed private home may have a crack or crevice through which air or odors may unintentionally and unexpectedly escape to its curtilage. Allowing a dog to sniff the air and odors that escape from within a home under a door is tantamount to physical entry into that home. Under the view articulated by the dissent, a dog entering a home through the front door, a window, or any other large crack or crevice would not amount to an unconstitutional search. Surely we cannot permit the sanctity of the privacy of our homes to be measured by the size of the cracks or crevices from which air may escape.
My esteemed colleague in dissent incorrectly asserts that a recognition of the right of Floridians to be free from unauthorized dog sniffs in their homes is a violation of United States Supreme Court precedent. Specifically, my colleague relies on four inapplicable United States Supreme Court decisions that approve the validity of dog sniffs in limited, situations outside the home, each of which is so clearly distinguishable from the facts presently before the Court. In United States v. Place, 462 U.S. 696, 697-98, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the narrow question before the United States Supreme Court was whether the Fourth Amendment prohibits law enforcement authorities from temporarily detaining personal luggage *59 outside the home in a public place for exposure to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contains narcotics. In United States v. Jacobsen, 466 U.S. 109, 111, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court simply determined whether police needed to obtain a warrant before searching a damaged package in a public location, visibly leaking a white powdery substance, while in the possession of a private freight carrier. In City of Idianapolis v. Edmond, 531 U.S. 32, 34, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the United Supreme Court considered in a public place the “constitutionality of a highway checkpoint program whose primary purpose is the discovery and interdiction of illegal narcotics.” (Emphasis supplied.) Finally, in Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the question before the Court was in a public place or roadway “[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop.” (Emphasis supplied.) None of these decisions, or any other decision of the United States Supreme Court, has ever addressed whether the Fourth Amendment requires reasonable, articulable suspicion to justify a dog sniff under the front door of a single family private residence. Accordingly, contrary to the assertion of the dissent, there is no “binding United States Supreme Court precedent” to violate. Dissenting op. at 61.
The core of the dissent’s opinion fails to accommodate and is built upon a lack of appreciation for the elevated status that a protected private home has in both this Court and the United States Supreme Court. The dissent asserts that “[bjeeause the dog sniff is only capable of detecting contraband, it is only capable of detecting that which is not protected by the Fourth Amendment.” Dissenting op. at 70. Perhaps this statement holds true for luggage in a public airport, a package in a public transport and distribution facility, or in a vehicle on a public roadway, but as discussed above, there are many intimate details associated with the content and odors that may flow from the cracks and crevices of a home. Each of the aforementioned items carries an expectation of privacy that is in no way as great as the expectation of privacy that exists in an individual’s home. The dissent fails to accommodate and recognize the increased expectation of privacy that exists in one’s home, an expectation that all courts have recognized as greater than any other. To dismiss the critical difference between this case, involving a dog sniff of an individual’s home, and the four other cases relied on by the dissent dangerously undermines the most sacrosanct place that is vulnerable to intrusion by the government, our homes.
Further, the complete absence of any United States Supreme Court precedent on dog sniffs of the cracks and crevices of a private home does not in any way preclude this Court from declaring such a search unconstitutional; rather, it empowers this Court to do so. Although it is true that article 1, section 12 of the Florida Constitution requires this Court to “follow the interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide to Florida citizens no greater protection than those interpretations,” Soca v. State, 673 So.2d 24, 27 (Fla.1996), it is also true that in the absence of a controlling United States Supreme Court decision, Florida courts are still not prohibited from providing our citizens with a higher standard of protection from governmental intrusion than that afforded by the Federal Constitution. See id. at 26-27 (citing State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983)).
*60 Third, the lack of a uniform system of training and certification for drug detection canines makes it unconstitutionally difficult for a defendant to challenge a dog sniff after circumstances such as these have occurred. As articulated by the Second District Court of Appeal in Matheson v. State, 870 So.2d 8, 14 (Fla. 2d DCA 2003):
[ Conditioning and certification programs vary widely in their methods, elements, and tolerances of failure. Consider, for example, the United States Customs Service regime:
The Customs Service puts its dog and handler teams through a rigorous twelve-week training course, where only half of the canines complete the training. Customs Service dogs are trained to disregard potential distractions such as food, harmless drugs, and residual scents. Agents present distractions during training, and reward the dogs when those diversions are ignored. The teams must complete a certification exam in which the dog and handler must detect marijuana, hashish, heroin, and cocaine in a variety of environments. This exam and the following annual recertifica-tions must be completed perfectly, with no false alerts and no missed drugs. If a dog and handler team erroneously alerts, the team must undergo remedial training. If the team fails again, the team is disbanded, and the dog is permanently relieved from duty.
[Robert C. Bird, An Examination of the Training and Reliability of the Narcotics Detection Dog, 85 Ky. L.J. 405, 410-11 (1997) ]. In contrast, the testimony below disclosed that Razor and his handler had undergone just one initial thirty-day training course and one week-long annual recertification course. In neither course was Razor conditioned to refrain from alerting to residual odors. Whereas the Customs Service will certify only dogs who achieve and maintain a perfect record, Razor’s certification program accepted a seventy percent proficiency. These disparities demonstrate that simply characterizing a dog as “trained” and “certified” imparts scant information about what the dog has been coitditioned to do or not to do, or how successfully.
Finally, dogs themselves vary in their abilities to accept, retain, or abide by their conditioning in widely varying environments and circumstances. “[Ejach dog’s performance is affected differently by working conditions and its respective attention span. There is also the possibility that the handler may unintentionally or otherwise prompt his dog to alert.” [Max A. Hansen, United States v. Solis: Have the Government’s Su-persniffers Come Down With a Case of Constitutional Nasal Congestion?, 13 San Diego L.Rev. 410, 416 (1976) ]. The Customs Service monitors its dogs’ performance in the field. Recognizing that a dog’s ability can change over time, it maintains records for only thirty to sixty days, then discards them because older records are not probative of the dog’s skills. Bird, 85 Ky. L.J. at 415. The Hillsborough County Sheriffs Office maintained no records of Razor’s performance, and his handler had not kept track.
(Emphasis supplied.) Due to the clear lack of uniformity in certification for drug detection dogs, the Second District in Matheson held that the fact that a dog is trained and certified, standing alone, is insufficient to establish probable cause to search a home based exclusively on the dog’s alert. See id. I agree with the sound reasoning articulated in Matheson. The complete lack of a uniform or stan *61 dardized system of certifying drug detection canines renders it unduly burdensome for a defendant to challenge the validity of an intrusive dog sniff into a private home that results in an arrest. Forcing finders of fact to rely exclusively on the assertions of police officers that their own dogs are properly trained is inconsistent with our time honored understanding of due process. Here, the probable cause affidavit simply notes that the drug detection dog received “weekly maintenance training,” but does not at all indicate what that training entails or how extensive that training may be. See Jardines, 9 So.3d at 2. This statement, void of any specificity or substance, cannot serve as an irrefutable declaration that establishes a dog’s ability to detect drugs.
Finally, the dissent asserts that “distinguishing this ease from the United States Supreme Court’s dog sniff cases based upon the level of embarrassment the majority presumes to be present here is improper.” Dissenting op. at 69-70. This case involves an unconstitutional search of a private residence by dogs without any verifiable training, the underlying premise of which does not pass constitutional muster. The level of embarrassment suffered by the party that has been searched is not a significant part of the constitutional analysis and does not in any way negate the constitutional invalidity of the search.
We cannot permit the protections of the Fourth Amendment, fragile as they may be, to be decimated piece by piece and little by little until they become mere vestiges of our past. All courts recognize that the home and curtilage of a home are protected and the protection is determined by factors with regard to whether an individual reasonably may expect that the area in question should receive the same status as the home itself. The cracks and crevices around our front doors or windows that may permit air to unintentionally escape are surely in a reasonably free society areas protected by our most cherished document.
PARIENTE and LABARGA, JJ., concur.