18 So.3d 1052 (2008)
Gaynor Earl TEDDER, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-3424.
District Court of Appeal of Florida, Second District.
March 7, 2008.
Rehearing Denied April 30, 2008.
James Marion Moorman, Public Defender, and Siobhan Helene Shea, Special Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Helene S. Parnes, Assistant Attorney General, Tampa, for Appellee.
CANADY, Judge.
Gaynor Earl Tedder, Jr., appeals from his convictions and sentences for armed home invasion robbery and five counts of armed kidnapping, arguing that the trial court should have granted his motion to suppress. Without further comment, we affirm the trial court's ruling that certain *1053 statements made by Tedder after his arrest should not be suppressed. We hold that the trial court correctly denied Tedder's motion to the extent that it sought to suppress certain statements Tedder made to officers before a canine alert on his vehicle. We conclude, however, that because the State did not prove that a canine alert provided probable cause for a search of Tedder's vehicle, the trial court should have suppressed all the evidence obtained as a result of that search.

I. Background

On March 25, 2003, Sergeant James Creghan was on patrol in Fort Myers at approximately 3:45 a.m. when he saw a white pick-up truck parked in a dark area behind a 24-hour Mobil gas station. Creghan pulled up near the truck and saw Tedder and Michael Varnum. When Creghan parked his vehicle and got out, Tedder was standing by the truck and Varnum was walking toward a pay phone. Creghan asked Tedder, "what's up." Tedder responded that they were in the Fort Myers area because Varnum had a job setting tile. Creghan then looked in the open bed of the truck, where he saw a fishing pole and an opaque Tupperware container. Finding Tedder's explanation suspicious because he did not see any tile-setting tools in the open bed of the truck, Creghan requested identification from both Tedder and Varnum. Both provided driver's licenses showing addresses in Panama City. Creghan called in a warrants check using a portable radio he carried on his person. While Creghan was running the warrants check, two back-up officers arrived.
After the warrants check on both Tedder and Varnum came back clear, Creghan asked the back-up officers to complete "Field Interrogation Cards" on the two men, due to a history of burglaries in the area. Tedder and Varnum were interviewed separately over a period of from 20 to 30 minutes. During the course of their interviews, Tedder gave an explanation of their journey from Panama City to Fort Myers that was inconsistent with Varnum's explanation. While these interviews were being conducted, the officers retained possession of the driver's licenses.
As the officers were completing the field interrogation cards, a canine officer arrived at the scene with his narcotics detection dog, Rex. Creghan instructed the canine officer to walk Rex around Tedder's truck. During that walk, Rex alerted to the passenger door. Although the ensuing search of Tedder's truck did not reveal any illegal drugs, it did reveal duct tape, masks, and other items that connected Tedder to a home invasion robbery that had occurred two weeks earlier several blocks from the Mobil station. Tedder was then arrested and subsequently charged with one count of armed home invasion robbery and five counts of armed kidnapping.
Tedder filed a motion to suppress the evidence obtained as a result of the search of his truck, arguing that Rex's alert was insufficient to provide probable cause for a search of the truck. At the hearing on the motion, the canine officer, Officer Short, testified that Rex was certified as both a patrol dog and a narcotics detection dog. Short testified that he and Rex had attended a 400-hour basic academy course for patrol work and a 400-hour narcotics detection course. Rex was certified in narcotics detection by the National Police Canine Association, and he had been recertified every year for the past six years. Rex had also undergone in-service training, including three 40-hour seminars and various workshops with Short. In March 2003, at the time of this incident, Rex was trained to detect methamphetamine, LSD, *1054 heroin, all forms of cocaine, and all forms of marijuana.
Short testified that narcotics detection dogs are selected based on their "very high drive, willingness to work, fetch, retrieve, drop." He also testified that Rex was very successful during his training and that he had found Rex to be very reliable. However, Short testified that no records were kept concerning how accurate Rex had been at detecting narcotics in the field and that Short did not keep track of this himself. Short also denied that Rex had ever made a false alert because, in Short's opinion, the failure to find narcotics after an alert does not constitute a false alert. Instead, according to Short, it means that narcotics that were once there had simply been removed. Because of this asserted lack of false alerts, Rex had never undergone any remedial training due to false alerts in the field.
After considering this testimony, the trial court found that Rex was trained and certified and had continued his training as required to maintain his certification. The trial court also found that Officer Short's testimony was very credible. Based on these findings, the trial court concluded that Rex's alert on Tedder's truck was sufficient to provide probable cause for the search of the truck. Thus, the trial court denied Tedder's motion. On appeal, Tedder contends that the trial court's findings were insufficient to establish that there was probable cause for the search.

II. The Probable Cause Issue

Our resolution of this case is dictated by this court's decision in Matheson v. State, 870 So.2d 8 (Fla. 2d DCA 2003). In Matheson, this court held that the certification of a narcotics detection dog, standing alone, is insufficient to establish that the dog is reliable so as to allow the dog's alerts to constitute probable cause for a search. Id. at 14. Instead, this court held that the trial court must consider other factors, including
"the exact training the detector dog has received; the standards or criteria employed in selecting dogs for marijuana detection training; the standards the dog was required to meet to successfully complete his training program; the `track record' of the dog up until the search (emphasis must be placed on the amount of false alerts or mistakes the dog has furnished)."
Id. (quoting State v. Foster, 390 So.2d 469, 470 (Fla. 3d DCA 1980)). This court noted that particular emphasis must be placed on the dog's performance history or "track record." Id. at 15. We also held that the burden is on the State to present evidence on each of these factors to show that the search was justified by probable cause. Id. at 12.
Moreover, in Matheson, this court specifically rejected the position that an alert followed by a search in which no drugs are found is not a "false alert." Id. at 13. In doing so, we stated:
[I]n this case Razor's trainer acknowledged the tendency of narcotics detection dogs to alert on the residual odors of drugs that are no longer present.
This underscores one of three central reasons why the fact that a dog has been trained, standing alone, is not enough to give an officer probable cause to search based on the dog's alert. Razor's trainer acknowledged that a trained dog, doing what he has been conditioned to do, imparts to the officer merely that he detects the odor of contraband. To be sure, as the trainer maintained, this may not be a false alert when assessing the success of the dog's conditioning. But for Fourth Amendment purposes it is neither false nor positive. The presence of a drug's odor at an intensity detectable by the dog, but not by the officer, *1055 does not mean that the drug itself is present. An officer who knows only that his dog is trained and certified, and who has no other information, at most can only suspect that a search based on the dog's alert will yield contraband. Of course, mere suspicion cannot justify a search.
Id.
The State presented no evidence of Rex's "track record," including the number of false alerts or mistakes Rex had made in the field. The State's failure to present any evidence on this factor that the trial court is specifically required to consider under Matheson resulted in the State's failing to meet its burden to prove that Rex's alert provided the officers with the probable cause necessary to support the search. Thus, the trial court should have granted Tedder's motion to suppress the evidence obtained as a result of the search of Tedder's truck.
We acknowledge that the reasoning of Matheson, which we follow here, has been rejected by two other district courts. Both State v. Coleman, 911 So.2d 259 (Fla. 5th DCA 2005), and State v. Laveroni, 910 So.2d 333 (Fla. 4th DCA 2005), reject Matheson's, 870 So.2d at 15, requirement that the State adduce evidence establishing "the dog's performance history" to meet the State's burden of proof. As we recently did in Gibson v. State, 968 So.2d 631 (Fla. 2d DCA 2007), we certify direct conflict with Coleman and Laveroni.

III. The Illegal Detention Issue

Tedder's contention that he was illegally detained after the warrants check came back clearin particular, his contention that retention of his license by the officer necessarily resulted in a detentionis rejected. The officer's retention of Tedder's driver's license after the completion of the warrants check is not dispositive. The trial court found that "there was no indicia of coercion present from the time of [Tedder's] initial contact with law enforcement officials through the time when the K-9 unit alerted on his vehicle...." The court specifically determined "that law enforcement officials did not use their emergency lights or sirens, display their badges, remove their guns from their holsters, handcuff or physically restrain [Tedder], issue verbal commands[,] or otherwise speak in a tone of voice that would indicate that compliance was mandatory." There is no indication in the record that Tedder at any point manifested an unwillingness to cooperate or ever attempted to terminate the encounter. Based on the totality of circumstances, the retention of Tedder's driver's license after the warrants check did not in itself transform the encounter into a detention. The trial court was correct in denying suppression of Tedder's statements made prior to the time when the narcotics detection dog alerted on Tedder's vehicle.
Although the retention of a suspect's driver's license obtained in the course of a consensual encounter is a circumstance that may point to the conclusion that the encounter lost its consensual character, the failure of an officer to return a driver's license to a suspect instantly after the conclusion of a warrants check does not in itself establish that the suspect was detained. The significance of the retention of a driver's license must be evaluated in the context of the totality of the circumstances. See Golphin v. State, 945 So.2d 1174 (Fla.2006); see also Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
In the absence of any signs of coercion, the officer's retention of Tedder's driver's license while asking additional questions and completing a field interrogation card did not in itself transform the consensual *1056 encounter into a detention. Here, there is no evidence that the officers "effectively foreclos[ed] [Tedder's] ability to request the return of his identification so that he could proceed on his way," Golphin, 945 So.2d at 1188, or that "the circumstances of the encounter [otherwise became] so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave," Immigration & Naturalization Serv. v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

IV. Conclusion

In sum, we conclude that the trial court erred in not suppressing the evidence obtained as a result of the search of Tedder's truck but was correct in not suppressing the postarrest and presearch statements at issue. Because the trial court erred in failing to suppress the evidence obtained as a result of the search of Tedder's truck, we reverse Tedder's convictions and sentences.
Reversed and remanded for further proceedings; conflict certified.
WHATLEY, J., Concurs in part and concurs in result.
STRINGER, J., Concurs in part and dissents in part.
WHATLEY, Judge, Concurring in part and concurring in result.
I concur in the result and join in sections II and IV of Judge Canady's opinion.
STRINGER, Judge, Concurring in part and dissenting in part.
I concur in the reversal in section II but dissent from the affirmance in section III. As to section II, I agree with Judge Canady that this court is bound by Matheson to reverse the trial court's denial of Tedder's motion to suppress the evidence gathered as a result of Rex's alert. Therefore, I join in section II of Judge Canady's opinion without further comment.
However, I dissent from section III of Judge Canady's opinion. In my view, the encounter between Creghan and Tedder went bad before the canine officer arrived on the scene, and the trial court should have suppressed all of the evidence that was obtained after the warrants check on Tedder came back clear.
The testimony at the motion to suppress hearing established that Sergeant Creghan was on patrol at 3:45 a.m. when he saw a pick-up truck parked next to pay phones behind a 24-hour Mobil gas station. Creghan pulled up next to the truck and asked Tedder what he and his companion were doing in the Fort Myers area. After Tedder told Creghan that they were in the area because his companion had a job setting tile, Creghan looked in the open bed of the truck. There, he saw fishing poles and a large, opaque Tupperware container, but no tile-setting tools. Despite not knowing whether there were tile-setting tools in the large Tupperware container or in the cab of the truck, Creghan found Tedder's explanation suspicious.[1] Thus, Creghan requested identification from both Tedder and his companion. Both immediately provided driver's licenses which showed addresses in Panama City. Creghan then requested a warrants check on both men.
The warrants checks on both men came back clear; however, Creghan did not return the driver's licenses to Tedder or his companion. Instead, Creghan separated *1057 the two men and instructed Tedder to stand with one back-up officer while Creghan and another back-up officer moved a short way off to speak with Tedder's companion. Creghan spoke alternately with Tedder and his companion for twenty to thirty minutes, all while retaining Tedder's driver's license and while having Tedder stand with a back-up officer.
During the twenty to thirty minutes of questioning, Tedder and his companion gave conflicting accounts of their trip to the Fort Myers area and their activities since they had arrived. Because of this, Creghan decided to have the back-up officers complete "Field Interrogation Cards" on both men. Creghan handed Tedder's driver's license to one of the back-up officers to use in completing the "Field Interrogation Card." At the same time, Creghan called for a canine officer to respond to the scene. The canine officer arrived with Rex while the back-up officers were completing the Field Interrogation Cards, and Rex alerted to Tedder's truck. The resulting search revealed physical evidence that tied Tedder to a home invasion robbery that had occurred two weeks earlier.
Tedder subsequently sought to suppress the evidence obtained during the time between the completion of the warrants check and Rex's alert on his truck. This evidence consisted primarily of statements that, while not directly incriminating, could have raised a reasonable suspicion that Tedder and his companion had been involved in criminal activity. After considering the testimony of both Creghan and Tedder, the trial court found that the two had engaged in a consensual encounter until Rex alerted on Tedder's truck. This finding was based primarily on the fact that Creghan did not use his emergency lights or sirens, did not display his badge, did not remove his gun from his holster, did not order Tedder around, and did not handcuff or physically restrain Tedder. According to the trial court, these facts showed that Creghan did not use his authority to keep Tedder from leaving and going about his business, thus rendering the encounter a purely consensual one. Based on these findings, the trial court denied Tedder's motion to suppress the evidence obtained during the twenty to thirty minutes between the warrants check and Rex's alert. I believe this was error.
When considering a trial court's ruling on a motion to suppress, this court must defer to those factual findings that are supported by competent, substantial evidence. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). This court then reviews the application of the law to those facts de novo. Id. Here, the trial court's factual findings are supported by competent, substantial evidence so far as they go. However, the trial court's ruling completely ignores the undisputed fact that Creghan retained Tedder's identification for twenty to thirty minutes after the warrants check came back clear while he separated Tedder and his companion, had them each stand with a back-up officer, and then alternately questioned them about their activities. In my opinion, this fact is dispositive of this case and establishes that the initial consensual encounter morphed into an illegal detention.
As a general proposition, the police may request identification from a citizen during a consensual encounter and may briefly retain that identification for a reasonable time without converting the consensual encounter into a detention. See, e.g., Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (holding that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, *1058 and request consent to search his or her luggage, as long as the police do not convey a message that compliance with their requests is required" (internal citations omitted)); Golphin v. State, 945 So.2d 1174, 1177 (Fla.2006) (holding that the temporary retention of an identification card during a warrants check did not constitute a detention when the identification had been voluntarily given to police during a consensual encounter); Mays v. State, 887 So.2d 402, 403 (Fla. 2d DCA 2004); Watts v. State, 788 So.2d 1040 (Fla. 2d DCA 2001) (en banc). When the police have obtained and retained a citizen's identification during a consensual encounter, the question of whether that consensual encounter has been transformed into an investigatory detention is answered by considering the totality of the circumstances, including those involving the officer's approach to the citizen, the officer's demeanor during the encounter, and the circumstances surrounding the request for and retention of the identification. Golphin, 945 So.2d at 1184. Thus, if the police retain the citizen's identification for longer than the time reasonably necessary to conduct that warrants check or if the police engage in other actions that reflect a show of authority, the totality of the circumstances may show that these actions have transformed the consensual encounter into an investigatory detention. See, e.g., Bostick, 501 U.S. at 435, 111 S.Ct. 2382; Florida v. Royer, 460 U.S. 491, 501-02, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Mays, 887 So.2d at 403 n. 2 (noting that "there are instances when a police officer may transform a consensual encounter into a stop by retaining a driver's license in order to unreasonably delay the encounter"); Brye v. State, 927 So.2d 78, 82 (Fla. 1st DCA 2006) (holding that when an officer retained the citizen's identification after a warrants check came back clean, the citizen was effectively seized); State v. Campbell, 911 So.2d 192, 192-93 (Fla. 4th DCA 2005) (holding that a consensual encounter becomes a detention when the police continue to retain a citizen's identification after a warrants check has come back clean), review granted, 925 So.2d 1031 (Fla.2006); Golphin v. State, 838 So.2d 705, 707 (Fla. 5th DCA 2003) (noting that the police may engage in "further conduct" after a warrants check that causes a consensual encounter to lose its consensual nature), aff'd, 945 So.2d 1174 (Fla.2006). In that case, if the police do not have the reasonable suspicion necessary to support an investigatory detention after the completion of the warrants check, the continued retention of the citizen's identification constitutes an illegal detention. Campbell, 911 So.2d at 193.
In this case, the undisputed evidence shows that Creghan retained Tedder's driver's license while he questioned Tedder for twenty to thirty minutes after the warrants check came back clear. Moreover, even when Creghan decided to stop questioning Tedder, he did not return Tedder's driver's license but instead gave it to the back-up officer for use in completing a "Field Interrogation Card." Based on these undisputed facts, the trial court erred when it found that the consensual encounter lasted until Rex alerted to Tedder's truck. While the trial court's finding that Creghan and the other officers did not show authority by using their emergency lights or sirens, displaying their badges, removing their guns from their holsters, or ordering Tedder around is supported by the evidence, the trial court made no finding whatsoever as to the effect of Creghan's retention of Tedder's driver's license for twenty to thirty minutes on the consensual nature of the encounter. This extended retention of a driver's license is exactly the type of action that can transform an otherwise consensual encounter *1059 into an investigatory detention. Golphin, 945 So.2d at 1185 ("While a noncompulsory request for an individual's identification has been unlikely to implicate the Fourth Amendment in isolation, the retention of identification during the course of further interrogation or search certainly factors into whether a seizure has occurred."); Mays, 887 So.2d at 403 n. 2.
Moreover, the fact that the document retained by Creghan was Tedder's driver's license reinforces the nonconsensual nature of the encounter after the completion of the warrants check. In Golphin, the supreme court recognized that when a police officer obtains and then retains a driver's license from a motorist, that motorist is "`effectively immobilized.'" Golphin, 945 So.2d at 1186 (quoting United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983)). "`A reasonable person in these circumstances would not have believed himself free to leave. If Thompson had tried to drive away he could have been arrested for driving without a license.'" Golphin, 945 So.2d at 1186 (quoting Thompson, 712 F.2d at 1359-60). The court then recognized that the same analysis would not necessarily apply if the person speaking with the officer was a pedestrian. Golphin, 945 So.2d at 1186, 1188.
Here, Tedder and his companion were found standing next to Tedder's truck behind an open gas station. Tedder lived in Panama City, and his encounter with Creghan occurred approximately 500 miles away in Fort Myers. Tedder told Creghan that he was not in the area permanently; he had driven to Fort Myers with his companion because his companion had a job setting tile in the area. In addition, Tedder had personal belongings in his truck. Under these circumstances, Tedder was more akin to a motorist than a pedestrian. Faced with this situation, no reasonable person would believe that he could abandon his driver's license, his personal belongings, and his only means of transportation 500 miles from home and simply walk away from the encounter.
I recognize that the supreme court has eschewed any attempt to draw a bright line when it comes to determining what actions may constitute a detention for Fourth Amendment purposes. See Golphin, 945 So.2d at 1183-84. I do not attempt to draw such a bright line here, nor do I attempt to suggest that an officer must thrust identification back upon a citizen immediately once a warrants check comes back clear. I suggest only that retaining the driver's license of a motorist who is 500 miles from home while conducting a twenty to thirty minute interrogation of that motorist constitutes a detention of that motorist that must be supported by a reasonable suspicion of criminal activity. Because Creghan had no such reasonable suspicion in this case, I believe the trial court should have granted Tedder's motion to suppress the evidence obtained after the warrants check came back clear.
NOTES
[1] Creghan noted that the two men saw his cruiser before he pulled behind the Mobil station and that they took no steps to leave. Creghan testified that he found it suspicious that the men did not try to get in the truck and leave before he arrived. Presumably, Creghan would have also found it suspicious if the men had, in fact, tried to leave.