ALTENBERND, Judge,
Specially concurring.
I agree that the suppression of the 21.4 grams of powered cocaine found in the console of Mr. Wiggs’ car is required under the holding in Harris v. State, 71 So.3d 756 (Fla.2011). I write only to make several observations.
First, Zuul’s alert was just one circumstance that generated suspicion. When a Sarasota County deputy stopped Mr. Wiggs for running a red light at midnight, the officer observed that he seemed unusually nervous. Mr. Wiggs was sweating excessively and clapping his hands in a nervous manner. When asked about drugs in the car, Mr. Wiggs volunteered that he had recently been released from prison in Texas for trafficking in marijuana and that he was still on probation for that drug-related offense.[3] By the time Zuul arrived at the scene, the first officer had already obtained this information.
It is unclear to me how or whether a trial court can aggregate the suspicion created by such additional information with that created by an alert by a dog like Zuul. Even with Zuul’s less than perfect record, I am inclined to believe that the alert combined with this additional information should have been enough to permit this search, but it appears that Harris will not allow the trial court to even consider the alert by Zuul in this context.
*161 Second, in fairness to Zuul, his strength is also his weakness. It seems obvious that Zuul is alerting on residual drugs that do not lead to the discovery of arrestable quantities of drugs. It is not that Zuul is alerting when there are no drugs to smell; he is alerting to molecules of drugs left behind in vehicles where drugs have been used or transported. Thus, in Hams, the court is requiring that law enforcement train dogs to distinguish between the odor of minute quantities of drugs and larger quantities of drugs. If that cannot be done for a particular drug, it seems we will need to abandon dogs as a method of obtaining probable cause for that drug.
Finally, while the logic of Harris and this court’s earlier decision in Matheson v. State, 870 So.2d 8 (Fla. 2d DCA 2003), cannot be denied, I am troubled by the sense that we are using the exclusionary rule to suppress evidence that is found not by dogs that have failed to meet a minimum standard, but by dogs that were not trained to the level of best practice. I agree that we should attempt to achieve a level of best practice in all aspects of law enforcement, but I am troubled by the use of the exclusionary rule to achieve best practices. Although it might be a best practice, we do not, or at least to this time have not, required deputies to keep proficiency logs on the number of false alerts that they make when deciding to search suspects for possession of drugs or when deciding to arrest drivers for DUI.
Because law enforcement is required to maintain logs and comply with strict protocols to assure the proper calibration of breathalyzers, there is a temptation to require comparable logs and protocols for drug dogs. But dogs and breathalyzers perform significantly different functions. The result of a breathalyzer is often the critical evidence admitted at trial to prove beyond reasonable doubt that a driver is guilty of DUI. The dog is merely providing roadside information to help an officer decide whether there is probable cause to perform a search. Even if Zuul helps locate an arrestable quantity of illegal drugs only 36 percent of the time, I am not entirely convinced that evidence seized, based in part on his alert, must be suppressed. The notion that the exclusionary rule will be applied if a dog does not achieve a success rate of any particular percent, whether 25 percent or 75 percent, is establishing a bright line that I am not currently convinced to be constitutionally necessary.
Finally, many different law enforcement agencies in Florida employ dogs to perform many specific sniffs. I am concerned about the uncertainty that will now exist surrounding the need to obtain high levels of accuracy from these dogs. The dog in this case was sniffing for cocaine along the highway. If he were sniffing for explosives at the entrance to an international airport, I would surely hope that a 36 percent accuracy rate would support a search.

. Actually, Mr. Wiggs' record on his score-sheet reflects eleven prior felonies, including five prior drug-related offenses, which apparently were committed primarily in Florida.